| **Pekerman v Chessin** |
|:---:|
| 2025 NY Slip Op 33031(U) |
| July 30, 2025 |
| Supreme Court, New York County |
| Docket Number: Index No. 805093/2023 |
| Judge: John J. Kelley |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

PRESENT:  **HON. JOHN J. KELLEY**                    PART                    56M

_Justice_

-----------------------------------------------------------------------------X

VICTORIA PEKERMAN and PAUL BICHOVSKY,

                            Plaintiff,

                     - v -

DAVID CHESSIN, M.D., and ST. LUKE'S ROOSEVELT
HOSPITAL CENTER,

                            Defendants.

-----------------------------------------------------------------------------X

| | |
|---|---|
| INDEX NO. | 805093/2023 |
| MOTION DATE | 07/23/2025 |
| MOTION SEQ. NO. | 001 |

**DECISION + ORDER ON
MOTION**

The following e-filed documents, listed by NYSCEF document number (Motion 001) 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48

were read on this motion to/for                       JUDGMENT - SUMMARY            .

In this action to recover damages for medical malpractice based on alleged departures from good and accepted medical practice, lack of informed consent, and loss of spousal consortium, the defendants move pursuant to CPLR 3212 for summary judgment dismissing the complaint. The plaintiffs oppose the motion. The motion is granted only to the extent that the defendants are awarded summary judgment dismissing the lack of informed consent cause of action, and so much of the medical malpractice cause of action as sought to recover for any alleged adverse outcome that the defendants' purported malpractice may have engendered in connection with a post-surgical course of chemotherapy administered to the plaintiff Victoria Pekerman (the patient) to treat her for colon cancer. The motion is otherwise denied.

The crux of the plaintiffs' claim is that, on July 28, 2022, the defendant surgeon David Chessin, M.D., negligently performed colon resection surgery upon the patient at the defendant St. Luke's Roosevelt Hospital Center (St. Luke's), thus injuring her ureter. They further alleged that the defendants did not inform the patient that ureteral injury was a risk of that procedure.

[* 1]

In their complaint, the plaintiffs alleged, in general terms, that the defendants committed malpractice in their treatment of the patient, that they failed to inform the patient of the "risks, hazards and alternatives connected to the treatment rendered, so that an informed consent could be given," and that "[r]easonably prudent persons in plaintiff's position would not have undergone the treatment utilized if fully informed of the risks, hazards and alternatives connected with the treatment."  In their bill of particulars, they contended that the defendants were negligent in failing to take a proper history, conduct a proper physical examination, and perform appropriate radiological and laboratory studies, and in ignoring the significance of, and failing to act upon. the history that was elicited, the examination that was conducted, and the diagnostic studies that were performed.  With respect to the surgical procedure itself, they alleged in their bill of particulars that the defendants were negligent in using excessive force and misdirection in connection with their employment of surgical instruments, in failing to identify the anatomic location of the patient's ureter, in failing to avoid ureteral obstruction, in failing to stent the ureter intraoperatively, in damaging the ureter by negligently transecting it and causing a ureteral stricture, in failing to inspect the ureter prior to closure, and in failing intraoperatively to diagnose the injured ureter.  They further alleged that the defendants delayed in treating the injured ureter and failed to follow up with the patient subsequent to the subject surgery

The plaintiffs alleged that, as a consequence of the defendants' malpractice, the patient's left ureter was cut and compromised, and that she was caused to undergo a robotic left ureteral reimplantation with psoas hitch and Boari flap, and the placement of both a left ureteral stent and the placement and removal of a left nephrostomy tube, and that she was caused to experience sepsis and pyelonephritis.  They specifically alleged that the patient's urine became infected, necessitating intravenous antibiotic therapy, that her chemotherapy for treatment of adenocarcinoma of the colon was delayed, and that she experienced urinary dysfunction, including frequency and urgency, as well as pain in her small bladder.

805093/2023   PEKERMAN, VICTORIA ET AL vs. CHESSIN MD, DAVID ET AL                    Page 2 of 29
Motion No. 001

2 of 29

[* 2]

It is well settled that the movant on a summary judgment motion "must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to eliminate any material issues of fact from the case" (*Winegrad v New York Univ. Med. Ctr.*, 64 NY2d 851, 853 [1985] [citations omitted]). The motion must be supported by evidence in admissible form (*see Zuckerman v City of New York*, 49 NY2d 557, 562 [1980]), as well as the pleadings and other proof such as affidavits, depositions, and written admissions (*see* CPLR 3212). The facts must be viewed in the light most favorable to the non-moving party (*see Flanders v Goodfellow,* _____NY3d_____, 2025 NY Slip Op 02261, *1 [Apr. 17, 2025]; *Vega v Restani Constr. Corp.*, 18 NY3d 499, 503 [2012]). In other words, "[i]n determining whether summary judgment is appropriate, the motion court should draw all reasonable inferences in favor of the nonmoving party and should not pass on issues of credibility" (*Garcia v J.C. Duggan, Inc.*, 180 AD2d 579, 580 [1st Dept 1992]; *see Haymon v Pettit*, 9 NY3d 324, 327 n [2007]). Once the movant meets that burden, it is incumbent upon the non-moving party to establish the existence of material issues of fact (*see Vega v Restani Constr. Corp*., 18 NY3d at 503). A movant's failure to make a prima facie showing requires denial of the motion, regardless of the sufficiency of the opposing papers (*see id.; Medina v Fischer Mills Condo Assn.*, 181 AD3d 448, 449 [1st Dept 2020]). "The drastic remedy of summary judgment, which deprives a party of his [or her] day in court, should not be granted where there is any doubt as to the existence of triable issues or the issue is even 'arguable'" (*De Paris v Women's Natl. Republican Club, Inc.,* 148 AD3d 401, 403-404 [1st Dept 2017]; *see Bronx-Lebanon Hosp. Ctr. v Mount Eden Ctr*., 161 AD2d 480, 480 [1st Dept 1990]). Thus, a moving defendant does not meet the burden of affirmatively establishing entitlement to judgment as a matter of law merely by pointing to gaps in the plaintiff's case, but must affirmatively demonstrate the merit of his or her defense (*see Koulermos v A.O. Smith Water Prods*., 137 AD3d 575, 576 [1st Dept 2016]; *Katz v United Synagogue of Conservative Judaism*, 135 AD3d 458, 462 [1st Dept 2016]).

805093/2023   PEKERMAN, VICTORIA ET AL vs. CHESSIN MD, DAVID ET AL                    Page 3 of 29
Motion No.  001

3 of 29

"To sustain a cause of action for medical malpractice, a plaintiff must prove two essential elements: (1) a deviation or departure from accepted practice, and (2) evidence that such departure was a proximate cause of plaintiff's injury" (*Frye v Montefiore Med. Ctr.*, 70 AD3d 15, 24 [1st Dept 2009]; *see Foster-Sturrup v Long,* 95 AD3d 726, 727 [1st Dept 2012]; *Roques v Noble*, 73 AD3d 204, 206 [1st Dept 2010]; *Elias v Bash*, 54 AD3d 354, 357 [2d Dept 2008]; *DeFilippo v New York Downtown Hosp.*, 10 AD3d 521, 522 [1st Dept 2004]).  Such a cause of action may be premised upon a claim that those departures allowed a patient's condition to worsen, and thus deprived him or her of an opportunity for a cure or a better outcome (*see Mortensen v Memorial Hosp.*, 105 AD2d 151, 156, 159 [1st Dept 1984]; *Kallenberg v Beth Israel Hosp.*, 45 AD2d 177, 178 [1st Dept 1974], *affd no op.* 37 NY2d 719 [1975]). Moreover, where a physician fails properly to diagnose a patient's condition, thus providing less than optimal treatment or delaying appropriate treatment, and the insufficiency of or delay in treatment proximately causes injury, he or she will be deemed to have departed from good and accepted medical practice (*see Perez v Fitzgerald,* 115 AD3d 177, 178 [1st Dept 2014]; *Perlin v King*, 36 AD3d 495, 495 [1st Dept 2007]; *see generally Zabary v North Shore Hosp. in Plainview,* 190 AD3d 790, 795 [2d Dept 2021]; *Lewis v Rutkovsky*, 153 AD3d 450, 451 [1st Dept 2017]; *Monzon v Chiaramonte*, 140 AD3d 1126, 1128 [2d Dept 2016] ["(c)ases . . . which allege medical malpractice for failure to diagnose a condition . . .  pertain to the level or standard of care expected of a physician in the community"]; *O'Sullivan v Presbyterian Hosp. at Columbia Presbyterian Med. Ctr.*, 217 AD2d 98, 101 [1st Dept 1995]).

Even where an adverse outcome is a known risk of a surgical procedure, a plaintiff may raise a triable issue of fact as to whether a physician committed malpractice by showing that the outcome was caused by improper surgical or medical technique, rather than by an unexplained or incidental event (*see Bengston v Wang*, 41 AD3d 625, 626 [2d Dept 2007]; *see also Frederick v Osman*, 2023 NY Slip Op 32514[U], *8, 2023 NY Misc LEXIS 24096, *12 [Sup Ct, N.Y. County, Jul. 14, 2023] [Kelley, J.]; *Hoffman v Taubel*, 2021 NY Slip Op 31523[U], *4-5,

**805093/2023   PEKERMAN, VICTORIA ET AL vs. CHESSIN MD, DAVID ET AL**   Page 4 of 29
  **Motion No.  001**

4 of 29

2021 NY Misc LEXIS 2379, *8-9 [Sup Ct, N.Y.County, Apr. 30, 2021] [Kelley, J.], *affd* 208 AD3d 1099 [1st Dept 2022] [merely because the transection of a ureter is a known risk of a hysterectomy, it does not follow that a surgeon or a surgeon's assistant is excused from properly performing the procedure]; *Mathias v Capuano,* 2015 NY Slip Op 32160[U], *5-6, 2015 NY Misc LEXIS 4141, *12-14 [Sup Ct, Suffolk County, Nov. 5, 2015]; *cf. Henry v Duncan*, 169 AD3d 421, 421 [1st Dept 2019] [plaintiff failed to raise triable issue of fact in opposition to physician's showing that injury was a "known risk that may occur despite competent surgical care having been provided"]).

In support of their motion, the defendants submitted, among other things, the pleadings, the plaintiffs' bills of particulars, relevant medical and hospital records, the transcripts of the parties' deposition testimony, a statement of allegedly undisputed material facts, an attorney's affirmation, and the expert affirmation of board-certified surgeon and colorectal surgeon Walter Longo, M.D. In his affirmation, Dr. Longo asserted that the defendants did not depart from good and accepted medical practice either preoperatively, intraoperatively, and postoperatively, and that nothing that they did or did not do caused or contributed to the patient's claimed injuries. Dr. Longo opined that the patient's July 28, 2022 low anterior colon resection surgery was indicated, inasmuch as a recent biopsy correctly established a diagnosis of adenocarcinoma of her rectosigmoid junction, that Chessin performed the surgery in accordance with the standard of care, and that a ureteral injury was "a well-known and accepted risk of the procedure."

Dr. Longo further alleged that "given the timing of the onset of symptoms, lack of evidence that the ureter was cut in the medical records, as well as the presence of adhesions noted by the subsequent surgeon," the ureter injury that the patient experienced was consistent with a "thermal injury" that was neither preventable nor diagnosable at the time of surgery. He stated that the utilization of stents was not within the standard of care for the patient's resection procedure, and that there was no indication for the use of stents during the procedure, inasmuch as Chessin was able to visualize and protect the ureters during the entirety of the

805093/2023  PEKERMAN, VICTORIA ET AL vs. CHESSIN MD, DAVID ET AL                    Page 5 of 29
Motion No. 001

5 of 29

procedure. Dr. Longo averred that the postoperative care that the defendants rendered to the patient was appropriate and in accordance with the standard of care since, among other things, the patient was stable for discharge on August 1, 2022, and there were no signs or symptoms of any complications, including a ureter injury, at the time of her discharge.

As Dr. Longo explained it, assuming for argument's sake that there was a delay in diagnosing the patient's ureteral injury, any such delay did not cause any further injury to the patient, since she still would have required the same procedures to repair her ureter, and her outcome would have been the same. He further opined that the ureteral injury did not adversely affect her undergoing regimen of chemotherapy, inasmuch as she commenced chemotherapy approximately 9 weeks after the surgery and, thus, "well within" the "optimal" 12-week time-period between surgery and the initiation of chemotherapy.

Dr. Longo recapitulated the contents of the patient's preoperative medical charts, explaining that, in 2012, the patient had a colonoscopy, and that, on April 23, 2021, the patient, who was then 50 years old, presented to nonparty gastroenterologist Ron Palmon, M.D., for a follow-up appointment to discuss autoimmune atrophic gastritis. Dr. Palmon formulated a plan for the patient to undergo "repeat colonoscopy this year for screening," and, although the patient did not undergo a colonoscopy that year, Dr. Palmon performed that procedure upon the patient on n July 11, 2022, and thereupon identified a fungating obstructing large mass in the patient's rectosigmoid colon. Dr. Palmon ordered biopsies, after which the patient was diagnosed with adenocarcinoma of the rectosigmoid junction. Dr. Palmon referred the patient to Chessin.

On July 18, 2022, the patient first presented to Chessin. Dr. Longo opined that Chessin appropriately obtained, appreciated, and acted upon the patient's medical and surgical history, which included, along with her diagnosis of adenocarcinoma of the rectosigmoid junction, increasing discomfort in the abdominal area and increased stool frequency, some blood in the stool, and fecal urgency over the previous two to three months. According to Dr. Longo, Chessin also memorialized the patient's hypothyroidism and hypertension, as well her prior

805093/2023  PEKERMAN, VICTORIA ET AL vs. CHESSIN MD, DAVID ET AL                    Page 6 of 29
  Motion No.  001

[* 6]                                           6 of 29

caesarean section and sinus surgery. He further concluded that Chessin performed an appropriate examination of the patient, after which he concluded that there was no evidence of metastatic disease on computed tomography (CT scans) of her chest, abdomen, and pelvis, while Chessin confirmed the location of the tumor on a magnetic resonance imaging (MRI) scan. Dr. Longo came to the conclusion that, at that juncture, no further imaging or laboratory studies were indicated or needed prior to making recommendations as to the surgery and proceeding therewith. According to Dr. Longo, the tumor was located approximately 15 centimeters (cm) from the anal verge, which he explained was too high for neoadjuvant chemoradiation. Consequently, he opined that Chessin appropriately offered the patient the option of undergoing either of laparoscopic or an open low anterior resection. Dr. Longo concluded that, in these circumstances, Chessin appropriately recommended that the patient undergo laparoscopic colon resection surgery to remove the tumor, both for therapeutic purposes and accurately to "stage" the tumor for diagnostic purposes.

Dr. Longo asserted that, on July 28, 2022, the patient was admitted to St. Luke's under Chessin's care for a planned colon resection surgery. He rejected the plaintiffs' contention that Chessin negligently performed that procedure. According to Dr. Longo, Chessin utilized appropriate surgical technique, and proper medical and surgical judgment at all times in performing the laparoscopic low anterior colon resection, including appropriately identifying and protecting the ureters. As he explained it, ureteral injury is a well-recognized complication of colon resection surgery, and the patient sustained such an injury despite appropriate surgical care. In this respect, Dr. Longo averred that Chessin utilized appropriate surgical technique, and properly identified and protected the patient's ureters. He cited to Chessin's operative report, which noted that "the tumor was clearly palpable at the rectosigmoid juncture, and it extended distally to the previously placed tattoo that was placed colonoscopically," and that surgeon Carl Dickler, M.D., "assisted in the surgery and performed a flexible sigmoidoscopy to show [Chessin] exactly where the distal end of the tumor was to aid in determining the distal

**805093/2023   PEKERMAN, VICTORIA ET AL vs. CHESSIN MD, DAVID ET AL**                    **Page 7 of 29**
  **Motion No.  001**

[* 7]

transection point." According to that report, Chessin "began [his] dissection by incising the peritoneum over the mesentery of the distal sigmoid colon. The distal sigmoid colon mesentery was divided at its base using a LigaSure device," which produces heat through an electric current to enable cauterization and cutting. The report further stated that "[b]oth the right and left ureters were identified and protected during the entire dissection."

Based on the operative report, other medical records, and Chessin's deposition testimony, Dr. Longo opined that, during the surgery, Chessin "appropriately identified, protected and was aware of the anatomic location of the ureters," because, among other things, Chessin asserted that he "is always cognizant of the ureters and is always careful to protect them during the performance of the entire operation." As Dr. Longo characterized Chessin's testimony, when the latter is dissecting in areas where the ureters run, that is, in an area where a potential injury can occur, he and his assistants are "checking, checking, and rechecking" the ureters for signs of injury, which the former characterized as "appropriate." In this regard, Dr. Longo asserted that Chessin evaluated the patient's ureters intraoperatively for injury at the appropriate time, which was when he was operating in the pelvis, where the ureters run. He asserted that, once Chessin "was in the abdomen, and nowhere near where the ureters run, it was appropriate and in compliance with the standard of care, to not go back and check the ureters," since, as Chessin explained it, there is a fresh anastomosis, that is, a connection between two bodily structures, that no surgeon would wish to disturb.

Furthermore, Dr. Longo expressly rejected the plaintiffs' allegations that Chessin was negligent in using excessive force and misdirection in the use of surgical instruments, since he asserted that there was nothing in the operative report or medical records to support these claims. Rather, according to Dr. Longo, the operative report detailed good surgical technique and proper performance of the resection, and reported that, at the conclusion of the surgery, no complications, including any ureteral injury, had been identified, whether because it had been cut or otherwise had damaged. Dr. Longo conceded that the patient did, in fact, experience a

805093/2023  PEKERMAN, VICTORIA ET AL vs. CHESSIN MD, DAVID ET AL                                  Page 8 of 29
Motion No.  001

8 of 29

ureteral injury that eventually required a robotic left ureteral reimplantation, which was performed by urologist Michael Stifelman, M.D., at Hackensack University Medical Center in Hackensack, New Jersey (HUMC), on September 2, 2022, but concluded that Dr. Stifelman's operative report did not indicate or document that the patient's ureter had been transected. Rather, as Dr. Longo explained it, Dr. Stifelman's operative note reported that the ureter was identified just above the iliac, and that there were a significant number of adhesions and scar tissue present, which he described as "consistent" with a thermal injury. Moreover, Dr. Longo averred that the September 2, 2022 surgical pathology report referable to the ureter segment did not support the conclusion that there had been a cut to the ureter during Chessin's surgery. As Dr. Longo frame the issue, had Chessin transected the ureter during surgery, "it would have been obvious and noted during the repair procedure by Dr. Stifelman."

Dr. Longo further rejected the plaintiffs' contention that Chessin was negligent in failing to stent the ureters during the subject procedure, asserting that prophylactic stenting of the ureter is not the standard of care in connection with colon resection surgery, and that there was no prior medical history or other reason why Chessin should have stented the patient. Rather, he characterized the potential utilization of stents as "a judgment call to be made by the surgeon when there is a patient who is at high-risk, because of significant prior abdominal surgeries, that would alert a surgeon of the possibility of impaired visualization of the organs and operative field." Dr. Longo concluded that, in light of the patient's medical history, prophylactic stent placement was not warranted, and that, in any event, Chessin had no difficulty in identifying the ureters during the surgery, while the operative report did not memorialize the presence of any adhesions or a difficult dissection. In addition, Dr. Long asserted that, notwithstanding that opinion, there is no evidence that precautionary measures such as prophylactic stents prevent ureteral injury in the first instance, and that, as such, it was is purely speculative to conclude that, if stents were utilized, the patient's injury would have been avoided. Furthermore, he averred that additional manipulation via stenting can subject the patient to other potential injury,

805093/2023  PEKERMAN, VICTORIA ET AL vs. CHESSIN MD, DAVID ET AL                    Page 9 of 29
Motion No.  001

9 of 29

and that there was nothing else that Chessin could have done that would have avoided the "well-appreciated" risk of ureteral injury.

Dr. Longo also opined that all of the postoperative care that the defendants rendered to the patient was appropriate and in compliance with the standards of care, particularly because he concluded that the patient evinced no signs or symptoms of a ureteral injury prior to her August 1, 2022 discharge from the hospital, including any unexpected abdominal pain, nausea, vomiting, blood in her urine, difficulty urinating, or other urinary issues. He thus concluded that there was no merit to the plaintiffs' allegations that the defendants failed to perform a proper postoperative physical examination, failed to act upon the findings of the postoperative physical examinations that they did conduct, failed to see the patient at appropriate intervals after the surgery, or failed to conduct appropriate postoperative laboratory studies. In this regard, Dr. Longo concluded that, given both the objective and subjective postoperative physical condition of the patient, there were no indications that the defendants should have performed any postoperative radiological studies or additional laboratory studies. Dr. Longo further opined that, during her hospitalization, Chessin and other hospital personnel appropriately and closely monitored the patient, as they appropriately monitored her vital signs, pain levels, the postsurgical condition of the abdominal surgical wound, bowel movements, and blood test results, including blood urea nitrogen (BUN) and creatinine levels. As Dr. Longo interpreted the patient's chart, Chessin evaluated her on July 29, 2022, and "appreciated" that she was stable, with some incisional pain, was tolerating a regular diet without nausea, was passing flatus, and was merely awaiting the return of her bowel function, all of which he described as expected postsurgical findings that were inconsistent with a ureteral injury. According to Dr. Longo, later that day, surgeon Caroline Kim-Kiselak, M.D., reported that the patient's abdomen was soft, nondistended, and appropriately tender, while the BUN level in the patient's blood sample was 10 milligrams per deciliter of blood (mg/dL), and her creatinine level, which measures kidney function, was 0.96 mg/dL, both of which he described as within normal limits. Hence, Dr.

**805093/2023  PEKERMAN, VICTORIA ET AL vs. CHESSIN MD, DAVID ET AL**                    Page 10 of 29
  **Motion No.  001**

Longo, opined that, on July 29, 2022, or postoperative day one, the defendants rendered appropriate postoperative care and conducted all appropriate diagnostic testing.

With respect to July 30, 2022, or postoperative day two, Dr. Longo explained that surgeon Nipa D. Gandhi, M.D., examined the patient and reported that she was improving, inasmuch as she was appropriately passing gas, was ambulating, and was voiding her bladder well on her own. He noted that the patient's BUN level was 12 mg/dL, and that her creatinine level was 1.21 mg/dL. Dr. Longo further stated that the patient's chart indicated that she was seen on the evening of that date by surgeon Michael Schiff, M.D., who examined her, and reported that she was experiencing left lower quadrant discomfort that was controlled with Tylenol, Dilaudid, and a Lidocaine patch. Dr. Longo opined that those surgeons, who were covering for Chessin on that date, properly and timely examined and monitored the patient, and ordered the appropriate laboratory studies. In connection with the treatment and care of the patient on July 31, 2022, which was postoperative day three, Dr. Gandhi reported that the patient was tolerating a regular diet, ambulating, and voiding well on her own, while her BUN level was 11 mg/dL and her creatinine was 1.10 mg/dL, and that she was evaluated as "stable for discharge," with an outpatient follow-up appointment with Chessin scheduled. Dr. Longo concluded that, on that date, there were no findings that were consistent with a ureteral injury or that warranted additional testing, including radiologic or laboratory studies, and that all of the treatment that was rendered to the patient was at all times within the standard of care.

Furthermore, Dr. Longo asserted that, on August 1, 2022, which was postoperative day four, the patient continued to do well, since she was voiding well on her own, her pain was well controlled, her abdomen was soft, nondistended, and appropriately tender, and her incisions were clean, dry, and intact, with no sign of wound infection. As set forth in the patient's chart, Chessin examined her that day, and reported that she was tolerating a regular diet, passing flatus, and had had a bowel movement. Chessin further reported that her laboratory blood testing results, including for BUN and creatinine, were normal, with her creatinine decreasing

[* 11]

from the prior day's results. Chessin assessed her as "doing well," performed what Dr. Longo characterized as a "complete and thorough discharge exam," and concluded that she had appropriately recovered from surgery. According to the patient's chart, she was discharged to her home that day in stable condition, given discharge instructions, and was instructed to follow up with Chessin in two weeks. Dr. Longo adverted to the patient's deposition testimony, in which she averred that, at the time of her discharge, she thought that she was feeling better. Dr. Longo opined that the patient was indeed stable for discharge on August 1, 2022, and that it was appropriate to discharge her that day, since there were no findings at that time that were consistent with a ureteral injury or that warranted additional testing, including radiologic or laboratory studies, and that all the treatment that was rendered to her was at all times within the standard of care. As he described it, the patient had an "unremarkable" postoperative course, the level of her pain was improving while she was in the hospital, she was ambulating and voiding well on her own, she denied having experienced any nausea or vomiting on the day of her discharge, was passing flatus, and had a bowel movement prior to discharge.

According to Dr. Longo's interpretation of the patient's deposition testimony, it was not until a few days following discharge that she started to feel unwell. As he described it, on the morning of August 4, 2022, which was postoperative day seven, the patient was very nauseous and dizzy, had vomited twice, and had pain in her left side, which he described as an "acute change" her condition. She contacted Chessin to report her symptoms. Dr. Longo asserted that Chessin promptly appreciated the patient's complaints and appropriately directed her to seek immediate attention in the St. Luke's emergency department, which Dr. Longo described as satisfying the standard of care. When the patient presented to the emergency department on that day, she was afebrile, with what Dr. Longo characterized as a normal white blood cell count and liver function tests. Her BUN level was 9.1 mg/dL, and her creatinine level was 1.0 mg/dL, while her incisions were described as clean, dry, and intact, with ecchymosis surrounding the left lower quadrant, but an umbilical incision that did not evince erythema or fluctuance. As Dr.

805093/2023  PEKERMAN, VICTORIA ET AL vs. CHESSIN MD, DAVID ET AL                Page 12 of 29
Motion No. 001

12 of 29

Longo described it, a CT scan of the patient's abdomen and pelvis revealed "[d]elayed nephrogram left kidney with associated hydronephrosis and hydroureter to the mid pelvis described above—no evidence of infra-abdominal pelvic abscess present."

At 8:21 p.m. on August 4, 2022, critical care specialist So Youn Park, M.D., wrote in the patient's chart that, "[o]n discussion with urology there is concern for left ureter injury—will admit for possible stenting." Urologist Nir Tomer, M.D., examined the patient, and noted that she then had a BUN level of 13 mg/dL, and a creatinine level of 1.0 mg/dL. Upon reviewing the CT scan findings, Dr. Tomer wrote "[c]oncern for left ureteral obstruction in the setting of recent colorectal surgery." He recommended x-rays of the kidney, ureter, and bladder, and considered the placement of a left ureteral stent pending the x-ray results. According to Dr. Longo, the x-ray films revealed a delayed left nephogram, with mild left hydroureteronephrosis, while the distal left ureter was unopacified, which he explained was consistent with a history of ureteral injury. On August 5, 2022, endourologist William Atallah, M.D., assisted by endourologist Alan J. Yaghoubian, M.D., attempted to perform a cystoscopy upon the patient, with left retrograde pyelogram and left ureteroscopy. As Dr. Longo interpreted the operative report, the distal ureter was very narrow, approximately three to four cm from the ureterovesical junction. He asserted that the endourologists attempted to employ a wire to assist them in the procedure, but that the wire would not "catch" the proximal ureter, upon which those physicians determined to abort the procedure and consult with interventional radiologists and thereafter attempt an antegrade stent placement. Hence, on August 7, 2022, although interventional radiologists Robert Lookstein, M.D., and George Foulard, M.D., placed a left percutaneous nephrostomy tube in the patient under ultrasound and fluoroscopic guidance, Dr. Longo explained that antegrade access to the urinary bladder via the left ureter was unsuccessful at that time, as the mid-to-distal ureter was occluded, noting that, after the procedure, there was a clear, pink output in the nephrostomy tube, which Dr. Longo characterized as "expected."

805093/2023   PEKERMAN, VICTORIA ET AL vs. CHESSIN MD, DAVID ET AL          Page 13 of 29
   Motion No.  001

[* 13]                                                    13 of 29

On August 8, 2022, St. Luke's surgeon John Bishara, M.D., reported that the patient was experiencing mild pain that was controlled with medication, but was passing gas, having bowel movements, tolerating her diet, and ambulating, while her abdomen was soft and nontender, and she was evincing good drain output.   According to the chart, she was afebrile and there were no indications for the administration of antibiotics.  That same day, Chessin noted the events of the previous 24 hours, and reported that the drain was draining well.  He reported that the final pathology report in connection with the July 28, 2022 surgery revealed that the staging of the patient's colon cancer was T3N2b, meaning a Stage III cancer that had grown through the muscularis propria into pericolorectal tissues, with negative prognostic features.  Chessin discussed the case in detail with robotic urologist Ketan Badani, M.D., who planned to perform a left ureteral reimplantation within the following four weeks.  Dr. Longo expressed his opinion that Chessin appropriately discussed the pathology, the left ureter obstruction, and the plans and timing of the left ureter reimplantation and adjuvant chemotherapy with the patient.  At that time, the patient indicted that she would obtain a second opinion from a urologist at HUMC.

As Dr. Longo explained it, on September 2, 2022, at HUMC, Dr. Stifelman ultimately performed a robotic left ureteral reimplant upon the patient, with psoas hitch and Boari flap, left ureteral stent placement, and removal of the left nephrostomy tube that had been placed at St. Luke's.  Dr. Longo nonetheless opined that, when the patient had presented to the St. Luke's emergency department on August 4, 2022, the defendants timely appreciated a possible ureteral injury and complied with the standard of care by taking action in a timely fashion, and in timely diagnosing and treating the ureteral injury by ordering imaging to evaluate and address it. He concluded that the patient was properly evaluated and appropriately worked up and treated, inasmuch as St. Luke's medical staff obtained appropriate laboratory studies, imaging, and consultations with surgeons and urologists, and performed appropriate procedures in compliance within the standard of care.

805093/2023   PEKERMAN, VICTORIA ET AL vs. CHESSIN MD, DAVID ET AL                    Page 14 of 29
Motion No.  001

14 of 29

With respect to the etiology of the patient's ureteral injury, Dr. Longo opined that it was "consistent with a thermal injury." As he explained it, the LigaSure device that Chessin had utilized during the July 28, 2022 procedure is a thermal instrument that gives off heat which, in turn, can affect the surrounding structures and organs. He asserted that patients respond to heat in varying degrees, and that some may experience a breakdown of nearby tissue that does not immediately reveal itself. Dr. Longo stated that the energy source does not even need to touch the organ to have an effect, but can just be near it, and that, despite proper use of the LigaSure, ureteral injuries can occur from thermal heat spread. He further stated that a thermal injury to the adventitia of the ureter can cause compromised blood flow, which can lead to ureteral scarring and stricturing, which, in turn, can delay the presentation of symptoms. He opined that a thermal injury to the ureter cannot be diagnosed intraoperatively, inasmuch as it takes time to develop, and that such an injury can occur even in the absence of negligence. In this respect, Dr. Longo concluded that Chessin employed an appropriate surgical technique, including his use of the LigaSure device, and that the patient experienced a thermal injury despite Chessin's appropriate treatment. He noted that it, in light of the delayed onset of symptoms, her ureteral injury was consistent with a thermal injury that would not have been evident or diagnosable, either during the July 28, 2022 surgery, or at any time during that hospital admission. Dr. Longo averred that, had the patient's ureter had been cut during the July 28, 2022, surgery, as she claimed, she would have had symptoms within hours after the surgery, rather than seven days thereafter. In any event, Dr. Longo opined that an earlier diagnosis of a ureteral injury would not have altered the patient's ultimate outcome, as the treatment to repair the ureteral injury would have been the same, including, but not limited to, the need for cystoscopy, ureteroscopy, and the placement of a percutaneous nephrostomy tube for three to four weeks to allow her time for healing in advance of repair surgery. He concluded that the patient still would have been required to undergo the robotic left ureteral reimplant procedure with psoas hitch and Boari flap surgery. Additionally, Dr. Longo asserted that any

inaction on the part of the defendants did not cause any injury to the patient in connection with the administration of chemotherapy to further treat her colorectal cancer.

In opposition to the defendants' motion, the plaintiffs relied on many of the same documents that the defendants submitted. They also submitted an attorney's affirmation, a counterstatement of material facts, and the expert affirmation of a board-certified surgeon and colorectal surgeon. The plaintiffs' expert, in summary, opined that Chessin departed from the standard of care in failing adequately to identify and protect the patient's left ureter during the July 28, 2022 laparoscopic low anterior resection, that his failure to identify and protect the left ureter caused the patient to sustain an iatrogenic injury by application of a LigaSure device to the left ureter, thus causing subsequent injuries, that Chessin departed from the standard of care in failing to timely recognize and treat the injury intraoperatively, and that, had the ureteral injury been immediately recognized and repaired at the time of the July 28, 2022 surgery, the patient would have had a more favorable outcome, that is, her left ureter would, more likely than not, have returned to normal function. In addition, the plaintiffs' expert concluded that those departures from accepted practice proximately caused the patient to sustain left ureteral obstruction, scarring, pyelonephritis, sepsis, the need for placement of a nephrostomy bag, the need for antibiotic therapy and the use of nephrostomy tubes, and other pain and suffering.

In addition to reiterating the patient's course of treatment that Dr. Longo had described, the plaintiffs' expert also described her course of treatment between August 8, 2022 and the September 2, 2022 robotic reimplantation surgery at HUMC. The expert noted that, on August 9, 2022, the patient met with St. Luke's oncology nurse practitioner Monica An and oncologist Gabriel A. Sara, M.D., regarding adjuvant treatment for her metastatic adenocarcinoma, who both agreed that such treatment was warranted to treat possible microscopic metastases, and extensively discussed the rationale for using oxaliplatin-based chemotherapy with FOLFOX or CAPOX as adjuvant treatment options every two weeks, for a total of 12 cycles of up to six months. The patient was given an appointment for August 18, 2022 to follow up with St. Luke's

805093/2023 PEKERMAN, VICTORIA ET AL vs. CHESSIN MD, DAVID ET AL Page 16 of 29
Motion No. 001

16 of 29

oncologist and internist Peter Kozuch, M.D. Also on August 9, 2022, Chessin contacted the patient to inform her that Dr. Stifelman at HUMC was booked until mid-September 2022, and that she therefore might wish to contact urologist Ketan Badnani, M.D. to discuss management of the left ureter obstruction. On August 14, 2022, the plaintiff Paul Bichovsky, who is the patient's husband, advised Chessin that the patient was experiencing nausea, had not had a bowel movement in three days, and was funning fever of 100.9 degrees F., which decreased to 99 degrees with Tylenol. Bichovsky reported that the urine in his wife's nephrostomy drainage bag was clear. According to the plaintiffs' expert, Chessin advised Bichovsky that the patient should take MiraLax for constipation, and advise Chessin if anything changed. Later that day, however, Bichovsky called Chessin to inform him that he was taking the patient to the HUMC emergency department, where she was admitted, complaining of fever, chills, nausea, and abdominal pain since the previous might. A CT scan revealed pyelonephritis in the left kidney, and the patient also was diagnosed with sepsis and had positive urine cultures for multidrug-resistant Klebsiella bacteria with respect to samples taken the nephrostomy tube.

On August 16, 2022, the patient's left nephrostomy tube was exchanged, and she was prescribed intravenous antibiotics. On August 17, 2022, the patient was referred to HUMC oncologists Tracy Proverbs-Singh, M.D., and Martin Gutierrez, M.D., to discuss therapy options for Stage III adenocarcinoma of the colon. Dr. Proverbs-Singh recommended the adjuvant drug FOLFOX for 12 cycles over a period of six months, ideally commencing 4 to 6 weeks after the July 28, 2022 surgery, although she stated that the patient could wait for up to 12 weeks after the surgery at the latest. She formulated a plane to discuss the timing of any urothelial procedures with Dr. Stifelman. On August 18, 2022, the patient was discharged from her first admission to HUMC. On August 24, 2022, she followed up with Dr. Gutierrez for disease status assessment of cancer and further consideration of the management of her case. Dr. Gutierrez's plan was for the patient to complete her regimen of the intravenous antibiotic Ertapenem as of August 26, 2022 to treat the bacterial infection in her nephrostomy tube. He also recommended

the administration of the adjuvant drug FOLFOX over 12 cycles via placement of a subcutaneous port-a-cath or mediport, with the administration of that drug preceding ureteral intervention, but only if Dr. Stifelman would be amenable to that approach.  On August 25, 2022, the patient presented to Dr. Stifelman's office, after which Dr. Stifelman formulated a treatment plan that consisted of surgical repair with a left distal ureterectomy and left ureteral implant.

The operative report referable to Dr. Stifelman's September 2, 2022 robotic left ureteral reimplant, with psoas hitch and Boari flap, left ureteral stent placement, and removal of left nephrostomy tube, memorialized the presence of a significant number of adhesions, thus requiring "careful ureterolysis."  The operative report further stated that "this took 100% more time secondary to having previous surgery in this area 6 weeks prior and required meticulous sharp dissection."  As the plaintiffs' expert described it, once the ureter was freed, a vessel loop was placed under it and used for traction, and the ureter then was dissected distally toward the bladder.  Dr. Stifelman wrote that he "stopped about 3-4 cm from the bladder where the stricture and adhesions were the greatest" and injected the fluorescent dye indocyanine green (ICG) to confirm whether the ureter displayed normal shape and stricture.  He further wrote in the report that, "[g]iven the distance to the bladder, a side-to-side reimplant was deemed not possible," and he determined to pursue a reimplant with a psoas hitch.  According to the operative report, Dr. Stifelman cut the ureter at the level of the stricture, and spatulated the ureter by 1.5 cm, whereupon the ICG dye test confirmed excellent blood flow to the ureter.  According to the expert's interpretation of the patient's chart, the surgical pathology of the ureter segment showed patchy, mild chronic inflammatory infiltrates and reactive changes.  The expert noted that the patient was discharged to her home in stable condition on September 4, 2022.

The plaintiffs' expert conceded that ureteral injuries are a recognized occurrence in low anterior resection surgeries, characterizing them, however, as "infrequent and unacceptable."  The expert explained that more than 80% of ureteral injuries are iatrogenic, and can occur during laparoscopic procedures performed by general and colorectal surgeons.  To avoid injury,

805093/2023   PEKERMAN, VICTORIA ET AL vs. CHESSIN MD, DAVID ET AL          Page 18 of 29
Motion No.  001

18 of 29

the expert asserted that a surgeon's identification of the ureters during pelvic and colorectal surgery is strongly advised. As the plaintiffs' expert described it, the ureters rest on the psoas muscle in the inferior medial course and are crossed obliquely by the spermatic vessels and the genitofemoral nerve posteriorly. The expert asserted that the ureter crosses the pelvic brim in the front of, or just lateral to, the bifurcation of the common iliac artery. According to the plaintiffs' expert, in colorectal surgery, injury to the ureter usually occurs during high ligation of the inferior mesenteric artery, mobilization of the upper mesorectum near the sacral promontory, dissection deep in the pelvis in the plane between the lower rectum, pelvic sidewall, and bladder base, or dissection of the most cephalad portion of the perineal dissection in an abdominoperineal resection. As the expert further asserted,

> "[i]atrogenic ureteral injury recognized during surgery should also be repaired intraoperatively when identified rather than delaying for a subsequent surgery, if possible. A delayed diagnosis of a ureteral injury can lead to significant morbidity and complications, including but not limited to persistent flank or abdominal pain, urinary tract infection, hydronephrosis with or without loss of kidney function, ureteral stricture, urine leaks, sepsis, periureteral abscess, ureteral fistula, and urinary extravasation. Thus, the ureters should be checked and rechecked intraoperatively, and if injury is discovered, it should be repaired immediately."

The plaintiffs' expert alleged that, inasmuch as the risk of ureteral injury in colorectal surgery is so high, it is incumbent on the surgeon to demonstrate due diligence in identifying and protecting the ureters during the surgery, and that, at a minimum, when the procedure is anticipated to occur in the vicinity of the ureters, the surgeon should document that the ureters were identified and protected. With respect to the subject surgery, the expert stated that, although Chessin indicated in his note that he "protected it during the dissection," by the time of closure of the abdomen, "there was no indication whatsoever that he looked at the ureter again. He did not properly identify the ureter before each application of the LigaSure."

The plaintiffs' expert opined that, even if Chessin thought that he had identified the ureter each time he applied the LigaSure,

> "it was still incumbent upon him to inspect the ureter before he closed the abdomen. He should have rechecked the ureter prior to stapling, prior to each

805093/2023   PEKERMAN, VICTORIA ET AL vs. CHESSIN MD, DAVID ET AL                    Page 19 of 29
Motion No.  001

19 of 29

application of the LigaSure, and prior to closing the abdomen.  There is absolutely no indication in this case that he had done so."

In connection with this issue, the plaintiffs' expert referred to Chessin's deposition testimony, in which the latter, in response to a query as to whether he did anything before the end of the operation to assess and determine whether there had been any ureteral injury, asserted:

> "Yeah, so when you are dissecting areas where the ureters run, we're always checking to make sure that there's no injury to the ureter.  After you've done the operation, you are irrigating, you are closing the abdominal wall.  You haven't done anything different in that area.  *You would not go back there again and check yet another time*.

> "So during the dissection of that area, it's carefully checked, but right at the end of the operation *when you've done no further work in that area, you would not go back there and check yet again*"

(emphasis added).  The plaintiffs' expert asserted that, contrary to Chessin's description of proper surgical practice, Chessin "should have looked for the ureters before firing the stapler, and before each application of the LigaSure," and that, "[b]ecause he failed to do so, the injury was not recognized until much later," when the patient was readmitted to St. Luke's.

The plaintiffs' expert expressly agreed with Dr. Longo that the colon resection surgery was indicated, and that the patient's situation was not one in which a reasonably prudent patient would forgo the surgery for fear of possible complications, including the possibility of a ureteral injury.  Nonetheless, the expert disagreed with Dr. Longo that Chessin performed the July 28, 2022 surgery in accordance with the standard of care.  The expert explicitly opined that, contrary to Dr. Longo's opinion, the injury that the patient sustained was "not consistent with thermal spread."  In this respect, the expert explained that a review of the imaging and studies in this case confirmed that the ureter was sealed with a LigaSure device, and that there were no staples at the end of the ureter, but, rather, the staples were very remote from the ureter.  As the expert described it, the fact that the ureter was sealed essentially negated Dr. Longo's contention that the etiology of the injury to the ureter was "consistent with a thermal injury that was not preventable or diagnosable at the time of surgery."  The expert asserted that,

805093/2023   PEKERMAN, VICTORIA ET AL vs. CHESSIN MD, DAVID ET AL               Page 20 of 29
Motion No.  001

[* 20]

20 of 29

"[n]ot only is lateral thermal spread with the LigaSure quite minimal, only about 1.5 mm, but also if there was lateral thermal spread to the ureter, it would create an indiscriminate burn, not a seal, as could be seen in Ms. Pekerman's case.

"Furthermore, the burn would break down and urine would come out of the ureter (extravasation). There was no evidence at any time of urine within the abdominal cavity outside of the kidney or ureter. Had there been a leak in the ureter when she presented back to the hospital a few days after her surgery, the CAT scan would have shown a collection of urine (urinoma). This is not only confirmed by the imaging but also by the records. The only plausible etiology for the injury was a direct application of the LigaSure and firing of the LigaSure to the ureter."

The plaintiffs' expert further opined that, as a modern thermal device, the LigaSure is designed for minimal thermal spread as it seals off blood vessels, and has "the lowest thermal spread of any commonly used thermal device in surgery." The expert explained that heat is well-contained within the device. Consequently, and as purportedly evidenced by the imaging, the plaintiffs' expert concluded that it was far more likely that the ureter became incorporated in the jaws of the LigaSure during the process of dissection or division of the mesentery of the colon, and that, had the injury been caused by lateral thermal spread, the ureter would not have sealed in the manner that it did, and an indiscriminate burn would have been expected, rather than the sealed ureter which the expert observed on the relevant imaging.

The plaintiffs' expert surgeon and colorectal surgeon rejected, as "patently false," Dr. Longo's opinions that "a thermal injury to the adventitia of the ureter can cause compromised blood flow [and] can lead to scarring and stricturing of the ureter resulting in delayed presentation of symptoms" and that a "thermal injury cannot be diagnosed intraoperatively as it takes time to develop." The expert asserted that, contrary to Dr. Longo's opinions, there are two longitudinal blood vessels supplying the length of the ureter that are on opposite sides of the ureter, and that, even had there been sufficient thermal spread to injure both blood vessels---which the expert contended was "impossible with the LigaSure"---then the ureter itself would have been as equally burned as those two blood vessels, since it lies between them. According to the expert, this would have led to an "indiscriminate" burn of the ureter, and would have resulted in extravasation of urine when the burn broke down. As the expert explained, the

805093/2023  PEKERMAN, VICTORIA ET AL vs. CHESSIN MD, DAVID ET AL                    Page 21 of 29
Motion No.  001

imaging revealed that the blockage in the ureter was straight, and that it appeared that the ureter "was cut straight across and this is, more likely than not, precisely what happened." The expert noted, however, that, when Dr. Stifelman performed the reconstruction surgery on September 2, 2022, he traced the ureter down from the kidney end as far as he could go, and traced it to an area of scarring, upon which he deemed it inappropriate to dissect any further, and transected the ureter at that point. The expert explained that, consequently, no one has ever seen the actual end of the ureter where it was divided because it was buried in that scar tissue, making it impossible to separate it out without further damage. In other words, by that time, neither Dr. Stifelman nor anyone else would have been able personally to visualize or observe any prior cuts, transections, or burns of the ureter. In any event, the expert concluded that, had Chessin traced the ureter prior to closure, as the standard of care required, an injury such as this would have indeed been obvious intraoperatively. The plaintiffs' expert also expressly disagreed with Dr. Longo's contention that, had the patient's ureter in fact been cut during the July 28, 2022 surgery, the patient would have experienced adverse symptoms within hours following the surgery, rather than days after being discharged.

The expert concluded that Chessin departed from good and accepted practice in failing to recognize the injury immediately, since, once the injury is recognized, it can be immediately repaired without losing any significant amount of ureteral length, thus rendering a procedure employing a Boari flap or psoas hitch unnecessary. As the expert averred, such an injury is immediately recognizable by simply looking at the ureter, and tracing it up and down through the area where the surgery had been performed. Since a potential iatrogenic ureteral injury is always serious, the expert asserted that a surgeon must always ascertain the location of the ureter and, "if it is exposed, which it generally is, the surgeon must inspect it sufficiently to ensure that it has not been injured," which "requires less than a minute to do and should be done in any colon resection surgery." The plaintiffs' expert asserted that, if the injury is recognized intraoperatively, "as described, an end-to-end repair of the ureter can generally be

805093/2023  PEKERMAN, VICTORIA ET AL vs. CHESSIN MD, DAVID ET AL
Motion No. 001

Page 22 of 29

22 of 29

[* 22]

done over an indwelling stent, which usually consists of a double pigtail catheter (one of the pigtails is placed in the kidney and one of the pigtails is placed in the bladder), and the stent simply sits there for several weeks while the ureter heals."

The plaintiffs' expert also criticized Dr. Longo's factual statement that Chessin was able to visualize and protect the ureters during the entirety of the procedure. The expert asserted that this assertion was based only on "Chessin's self-serving deposition testimony," noting that Chessin never explained *what* he did to protect the ureter in his operative report or at his deposition, and made only a single reference to the ureter in his operative report. Given the risk of ureteral injury in connection with the patient's surgery, the expert opined that Chessin "needed to indicate that he looked at the ureter prior to closure."

The plaintiffs' expert further concluded that, contrary to Dr. Longo's opinion, there were indeed signs or symptoms of complications at the time of the patient's August 1, 2022 discharge from St. Luke's, including several that were concerning for ureteral injury. The expert explained that the patient's serum level of creatinine never returned to its preoperative baseline and that, although the level was not concerning in and of itself, the level never returned to normal "precisely because the ureter was obstructed." Although the expert conceded that the slight increase in the patient's creatinine level was insufficient to "trigger an investigation," the expert concluded that the creatinine concentration did not and could not rule out the presence of ureteral injury at the time. Hence, the expert rejected Dr. Longo's conclusion that "all postoperative findings were inconsistent with ureteral injury."

In addition, the plaintiffs' expert took issue with Dr. Longo's opinion that the delay in diagnosing and treating the patient's ureteral injury did not cause any further injuries. The expert explained that, in general, when an intraoperative ureteral injury occurs, a primary repair can be done as previously described, inasmuch as there is enough mobility in the ureter to perform such a repair. The expert opined that, had the injury been recognized and repaired at the time of the initial surgery on July 28, 2022, "it would have been far more likely" that the

patient "would have a normally functioning ureter," since scar tissue would not have yet developed, and the ureter would have some extra length or "play" in it.  In turn, the expert asserted that early detection would have enabled the surgeon to perform a simpler end-to-end repair, without tension, the need to alter the anatomy of the bladder, or the need for a Boari flap and psoas hitch, which are surgical techniques that the expert concluded could lead to complications, including urinary leakage, recurrent hydronephrosis, and postoperative bladder dysfunction, "all of which" the patient ultimately experienced.  As the expert explained, urine should flow in one direction---from the kidney, to the bladder, to outside of the body---while backwards flow of urine, such as might be anticipated with a Boari flap and psoas hitch procedure, leads to stagnation, bacterial overgrowth, and the possibility of kidney injury.

In reply to the plaintiffs' opposition papers, the defendants submitted an attorney's affirmation and the affirmation of urologist Richard Lee, M.D., along with a redacted copy of excerpts of the operative report referable to the August 5, 2022 cystoscopy, pyelogram and left ureteroscopy, and imaging from August 7, 2022.  The defendants' attorney argued that the affirmation of the plaintiffs' expert was conclusive, speculative, and not based on facts contained in the medical records.  She further argued that the expert failed to raise a triable issue of fact in connection with the issue of whether any purported departures from good practice caused or contributed to any injuries claimed by the plaintiff, and that the expert specifically failed to rebut the defendants' prima facie showing that the patient's ureteral injury adversely affected her ongoing regimen of chemotherapy.  Dr. Lee criticized the plaintiffs' expert, alleging that the expert's opinions were based on the "erroneous premise" that there was "no extravasation of urine from the ureter and that a sealed ureter can be identified on radiographic imaging."  Dr. Lee opined that, contrary to the expert's conclusions, "the records are clear that there was extravasation from the ureter.  Moreover, you cannot determine on imaging whether a ureter has been sealed, including by a Ligasure device."

805093/2023   PEKERMAN, VICTORIA ET AL vs. CHESSIN MD, DAVID ET AL          Page 24 of 29
Motion No.  001

24 of 29

The court concludes that the defendants established their prima facie entitlement to judgment as a matter of law in connection with the medical malpractice cause of action insofar as asserted against Chessin. The court further concludes, however, that the plaintiffs, through their submissions, including their expert's affirmation, raised triable issues of fact in connection with all of the departures from good and accepted practice that they asserted against Chessin, and whether those departures caused or contributed to injuries claimed by the patient, except their claim that those departures, and the ureteral injury itself, adversely affected the outcome of the patient's course of chemotherapy. With respect to the latter issue, although the plaintiffs' expert opined that the patient sustained injuries above and beyond the initial ureteral injury as a consequence of that injury, the expert did not expressly conclude that the outcome of the patient's chemotherapy was adversely affected thereby. In any event, and contrary to the defendants' contentions, the plaintiffs' expert based his or her opinions on facts in the record, and those opinions were specific and pointed, rather than speculative and conclusory. Moreover, Dr. Lee's reply affirmation simply underscores the sharp disagreement between the experts as to what the medical records actually reflected and revealed, and whether a physician can or cannot determine on whether a ureter has been sealed. Were the court to determine those issues on a motion for summary judgment, it would be usurping the jury's function, and improperly assessing the credibility of the experts, which the court may not do (*see Grasso v Nassau County,* 180 AD3d 1008, 1012 [2d Dept 2020] [defendants' contention that plaintiff's expert "misstated facts from the record" is an issue "as to the expert's credibility that should be resolved by a jury"]; *Torgersen v A&F Black Creek Realty, LLC*, 158 AD3d 1042, 1044 [3d Dept 2018]). Consequently, that branch of the defendants' motion seeking summary judgment dismissing the medical malpractice cause of action insofar as asserted against Chessin is granted only to the extent that they are awarded summary judgment dismissing so much of that cause of action against Chessin as alleged that the outcome of the patient's course of

805093/2023   PEKERMAN, VICTORIA ET AL vs. CHESSIN MD, DAVID ET AL
Motion No. 001

Page 25 of 29

25 of 29

chemotherapy was adversely affected by Chessin's alleged departures from good practice. That branch of the motion is otherwise denied.

"'In general, under the doctrine of respondeat superior, a hospital may be held vicariously liable for the negligence or malpractice of its employees acting within the scope of employment, but not for negligent treatment provided by an independent physician, as when the physician is retained by the patient himself'" (*Valerio v Liberty Behavioral Mgt. Corp.*, 188 AD3d 948, 949 [2d Dept 2020], quoting *Seiden v Sonstein*, 127 AD3d 1158, 1160 [2d Dept 2015]; *see Hill v St. Clare's Hosp.*, 67 NY2d 72, 79 [1986]; *Dupree v Westchester County Health Care Corp.*, 164 AD3d 1211, 1213 [2d Dept 2018]). There is no dispute that Chessin was an employee of St. Luke's when he performed the subject procedure and, hence, to the extent that there are triable issues of fact as to whether he departed from good and accepted practice, and whether his departures caused or contributed to any claimed injuries, there are triable issues of fact as to whether St. Luke's may be held vicariously liable therefor. In opposition to the defendants' prima facie showing that no other St. Luke's employee committed malpractice, the plaintiffs failed to raise a triable issue of fact and, hence, St. Luke's may not be held liable for the malpractice of any of its other employees.

The elements of a cause of action to recover for lack of informed consent are:

> "(1) that the person providing the professional treatment failed to disclose alternatives thereto and failed to inform the patient of reasonably foreseeable risks associated with the treatment, and the alternatives, that a reasonable medical practitioner would have disclosed in the same circumstances, (2) that a reasonably prudent patient in the same position would not have undergone the treatment if he or she had been fully informed, and (3) that the lack of informed consent is a proximate cause of the injury"

(*Spano v Bertocci*, 299 AD2d 335, 337-338 [2d Dept 2002]; *see Zapata v Buitriago*, 107 AD3d 977, 979 [2d Dept 2013]; *Balzola v Giese*, 107 AD3d 587, 588 [1st Dept 2013]; *Shkolnik v Hospital for Joint Diseases Orthopaedic Inst.*, 211 AD2d 347, 350 [1st Dept 1995]). For a statutory claim of lack of informed consent to be actionable, a defendant must have engaged in a "non-emergency treatment, procedure or surgery" or "a diagnostic procedure which involved

**805093/2023  PEKERMAN, VICTORIA ET AL vs. CHESSIN MD, DAVID ET AL**
**Motion No. 001**

**Page 26 of 29**

[* 26]

26 of 29

invasion or disruption of the integrity of the body" (Public Health Law § 2805-d[2]). "'[T]his showing of qualitative insufficiency of the consent [is] required to be supported by expert medical testimony'" (*King v Jordan*, 265 AD2d at 260, quoting *Hylick v Halweil*, 112 AD2d 400, 401 [2d Dept 1985]; *see* CPLR 4401-a; *Gardner v Wider*, 32 AD3d 728, 730 [1st Dept 2006]). Hence, where a defendant establishes his or her prima facie entitlement to judgment as a matter of law in connection with a lack of informed consent cause of action by submitting an expert affirmation from a physician, a plaintiff can only raise a triable issue of fact by submitting "an expert affirmation stating with certainty that the information defendant[ ] allegedly provided to plaintiff before the [medical] procedures at issue departed from what a reasonable practitioner would have disclosed" (*Leighton v Lowenberg*, 103 AD3d 530, 530 [1st Dept 2013]). Nonetheless, expert testimony is not necessary with respect to the issue of whether a reasonably prudent person, fully informed, would not have consented to the treatment (*see Gray v Williams*, 108 AD3d 1085, 1086-1087 [4th Dept 2013]; *Hugh v Ofodile*, 87 AD3d 508, 509 [1st Dept 2011]; *Andersen v Delaney*, 269 AD2d 193, 193 [1st Dept 2000]; *Hardt v LaTrenta*, 251 AD2d 174, 174 [1st Dept 1998]; *Osorio v Brauner*, 242 AD2d 511, 511-512 [1st Dept 1997]).

"'The mere fact that the plaintiff signed a consent form does not establish the defendants' prima facie entitlement to judgment as a matter of law'" (*Huichun Feng v Accord Physicians*, 194 AD3d 795, 797 [2d Dept 2021], quoting *Schussheim v Barazani*, 136 AD3d 787, 789 [2d Dept 2016]; *see Godel v Goldstein*, 155 AD3d 939, 942 [2d Dept 2017]). Nevertheless, a defendant may satisfy his or her burden of demonstrating a prima facie entitlement to judgment as a matter of law in connection with such a claim where a patient signs a detailed consent form, and there is also evidence that the necessity and benefits of the procedure, along with known risks and dangers, were discussed prior to the procedure (*see Bamberg-Taylor v Strauch*, 192 AD3d 401, 401-402 [1st Dept 2021]).

The defendants established their prima facie entitlement to judgment as a matter of law in connection with the lack of informed consent cause of action with Dr. Longo's affirmation, in

805093/2023 PEKERMAN, VICTORIA ET AL vs. CHESSIN MD, DAVID ET AL Page 27 of 29
Motion No. 001

27 of 29

which he opined that Chessin fully explained the risks of the colon resection procedure to the patient, including the possibility of ureteral injury, as well as the benefits of the surgery, and alternatives thereto. He further concluded that the patient fully understood the risks, benefits, and alternatives, and that no reasonable patient in her situation would have foregone the surgery for fear of possible complications. In response, the plaintiffs' expert conceded that no reasonable patient would have refused to undergo life-saving surgery to treat Stage III colon cancer. Hence, summary judgment must be awarded to the defendants dismissing the lack of informed consent cause of action.

Accordingly, it is,

ORDERED that the defendants' motion is granted only to the extent that they are awarded summary judgment dismissing the lack of informed consent cause of action, and so much of the medical malpractice cause of action as sought to recover for any alleged adverse outcome that the their purported malpractice may have engendered in connection with the post-surgical course of chemotherapy administered to the plaintiff Victoria Pekerman to treat her for colon cancer, that cause of action and that claim are dismissed, and the motion is otherwise denied; and it is further,

ORDERED that that, on the court's own motion, the attorneys for all of the parties shall appear for an initial pretrial settlement conference before the court, in Room 204 at 71 Thomas Street, New York, New York 10013, on August 12, 2025, at 2:15 p.m., at which time they shall be prepared to discuss resolution of the action and the scheduling of a firm date for the commencement of jury selection.

805093/2023   PEKERMAN, VICTORIA ET AL vs. CHESSIN MD, DAVID ET AL          Page 28 of 29
Motion No.  001

28 of 29

This constitutes the Decision and Order of the court.

__7/30/2025__
__DATE__

_____
__JOHN J. KELLEY, J.S.C.__

| CHECK ONE: | ☐ CASE DISPOSED | ☒ NON-FINAL DISPOSITION | |
|---|---|---|---|
| | ☐ GRANTED | ☐ DENIED | ☒ GRANTED IN PART | ☐ OTHER |
| APPLICATION: | ☐ SETTLE ORDER | ☐ SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | ☐ INCLUDES TRANSFER/REASSIGN | ☐ FIDUCIARY APPOINTMENT | ☐ REFERENCE |

805093/2023   PEKERMAN, VICTORIA ET AL vs. CHESSIN MD, DAVID ET AL       Page 29 of 29
Motion No.  001